UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GEORGE JONES,

                Plaintiff,

       v.

LUMMI TRIBAL COURT, et al.,

              Defendants.

CASE NO. C12-1915JLR

ORDER DENYING MOTION
FOR PRELIMINARY
INJUNCTION

## I.      INTRODUCTION

This matter is before the court on Plaintiff George Jones's "Motion/Declaration for Emergency Hearing." (Mot. (Dkt. 3).) In his motion, Mr. Jones "requests an emergency hearing on the Petition for Writ of Habeas Corpus/Declaratory and Injunctive Relief." (*Id*. at 1.) In his complaint, he states that he seeks "[i]mmediate release of [his] minor child from the custody of her aunt and return of the child to the custody of [her] father." (Compl. (Dkt. # 1) at 1.) Mr. Jones alleges that his daughter ("M.J.") was removed from his custody and placed in the custody of her maternal aunt based on an

order from Defendant Lummi Tribal Court ("LTC").  Although not specifically

denominated as such, the court has construed Mr. Jones's motion as one for preliminary

injunction under Federal Rule of Civil Procedure 65.  LTC has appeared in this action

(Not. of Appear. (Dkt. # 4)),[1] filed an answer to Mr. Jones's complaint (Dkt. # 8), and

filed a response to Mr. Jones emergency motion (Resp. (Dkt. # 10)).   The court held oral

argument on November 29, 2012.  The court has considered Mr. Jones's motion, all

submissions filed in support and opposition thereto, both before and after oral argument,

and the applicable law.  Being fully advised, the court DENIES Mr. Jones's motion.

## II.     BACKGROUND

In his complaint, Mr. Jones alleges that, on September 20, 2012, pursuant to an

order from the LTC, Island County Sheriff's deputies removed his four-year old

daughter, M.J., from his home in Oak Harbor, Washington, and placed M.J. in the

custody of her maternal aunt.  (Compl. at 3.)  Mr. Jones also alleges that neither he, nor

his daughter's mother, nor his daughter is a member of the Lummi Nation.  (*Id.*; Jones

Decl. at 3 (contained within Mot.).)  He further alleges that neither he, nor his daughter's

mother, nor his daughter has ever lived on the Lummi Reservation.  (Compl. at 3.)  He

has also specifically asserted that M.J. "has never been domiciled on the Reservation and

was not found on the Reservation when she was taken into custody."  (Mot. at 2.)

---

[1]Mr. Jones also sued the Honorable Mary Cardoza, the Lummi Tribal Judge who is
presiding with respect to the custody proceedings involving M.J.  Although Judge Cardoza had
not previously appeared in this proceeding, at the November 29, 2012 oral argument, counsel for
LTC stated that she also represented Judge Cardoza.

1    Jackie Rose Jones, M.J.'s mother, testified before the LTC that although she and

2    Mr. Jones are married (Neil Decl. (Dkt. ## 12, 13, 14) Ex. (Dkt. # 12-1) at 16),[2] they

3    have been separated for approximately two years (*id.* Ex. (Dkt. # 13-1) at 56).  Since that

4    time, Ms. Jones testifies that she has lived on the Lummi Reservation.  (*Id.*)  Ms. Jones

5    also implicitly acknowledges that since she and Mr. Jones have separated, M.J. has lived

6    with her father.  (*See id.* Ex. (Dkt. # 13-1) at 55 ("When we split up . . . he kept my

7    daughter.").)

8    Mr. Jones has submitted letters (or portions of letters) from the Washington State

9    Department of Social & Health Services, Division of Child Support ("DCS"), to Ms.

10   Jones indicating that DCS considered Mr. Jones to be the custodial parent (10/29/12

11   Jones Decl. (Dkt. # 1-1) Ex. 7).  Mr. Jones, however, has not submitted any court order

12   granting him, rather than Ms. Jones, primary or sole custody of M.J.  Indeed, there are

13   indications in the record that Ms. Jones has not consented to M.J.'s residence with her

14   father, and that Mr. Jones simply assumed custody of M.J. despite Ms. Jones's

15   objections.  (*See, e.g.*, *id.* Ex. (Dkt. # 12-2) at 52 ("You [Mr. Jones] wouldn't let me

16   [Mrs. Jones] take her [M.J.]."); Ex. (Dkt. # 13-1) at 59 ("And I already knew, I mean it's

17   always just an argument behind our daughter and so I was just like let me have my son

18   ――――――――――――――――――

19   [2]Counsel for LTC filed the identical declaration twice on the court's docket.  (*See* Dkt. ##
     12, 13.)  She also filed the various exhibits referenced in her declaration in three different places.

20   (*See* Dkt. ## 12 (attachments 1-4), 13 (attachments 1-2), 14 (attachments 1-5).)  The court will
     endeavor to provide meaningful citations to this portion of the record by referring to the exhibits

21   in counsel's declaration by docket number.  The court cautions counsel for both parties in the
     future to file evidence in a coherent fashion and to provide specific page references to the

22   portions of the record they cite in their memoranda.

1    because any other time I tried to leave it was just – I could only take my son.").)  In

2    addition, the incident of domestic violence between Mr. Jones and Ms. Jones, discussed

3    below, also provides some support for the notion that Ms. Jones may not have consented

4    to Mr. Jones's assumption of custody over M.J. during the period of their marital

5    separation.

6        The LTC states that Ms. Jones sought an order of protection against Mr. Jones

7    after Mr. Jones committed acts of domestic violence against Ms. Jones on Lummi

8    Reservation trust land.  (Resp. at 2; *see* Neil Decl. Ex. (Dkt. # 14-1) (attaching Order for

9    Protection – Domestic Violence).)  Mr. and Ms. Jones were spending the weekend

10   together on the Lummi Reservation, along with their daughter ("M.J.") and Ms. Jones's

11   minor son.  (*Id.* Ex. (Dkt. # 13-1) at 47).[3]  The domestic violence at issue was apparently

12   precipitated by an argument over obtaining illegal drugs or by Ms. Jones's and/or Mr.

13   Jones's drug use.[4]  (*Id.* Ex. (Dkt. # 12-1) at 54-56, Ex. (Dkt. # 13-1) at 46-47, 55, 60.)

14

15   _____

16       [3]Ms. Jones's son is not Mr. Jones's biological child, and Mr. Jones is not seeking custody
     of him.  (Jones Decl. (Dkt. # 1-1) at 3.)

17       [4]Many of the allegations by and much of the testimony from Mr. Jones and Ms. Jones
     concerning their own behavior and the behavior of the other is lamentable.  For example, both
18   Ms. Jones and Mr. Jones testified that their relationship was marred by acts of domestic violence.
     (Neil Decl. Ex. (Dkt. # 12-1) at 18-20, 25, 28; Ex. (Dkt. # 13-1) at 45-46.)  Mr. Jones has
19   testified that Ms. Jones has abused a variety of illegal drugs throughout their relationship.  (*See*
     Neil Decl. Ex. (Dkt. # 13-1) at 46.)  Ms. Jones has testified that both she and Mr. Jones use
     illegal drugs, and that Mr. Jones has dealt drugs.  (*Id.* Ex. (Dkt. # 12-1) at 21, 33-34; Ex. (Dkt. #
20   13-1) at 59-60.)  Mr. Jones testified that Ms. Jones has engaged in prostitution, and she has
     admitted to engaging in prostitution.  (*See id.* Ex. (Dkt. # 12-1) at 17; Ex. (Dkt. # 13-1) at 45.)
21   Ms. Jones has testified that Mr. Jones served as her pimp during portions of their relationship.
     (*See id.* Ex. (Dkt. # 12-1) at 17, 21-22, 24.)  Mr. Jones has testified that the drugs he uses are
     prescribed for medical conditions and that he never served as Ms. Jones's pimp.  (*Id.* Ex. (12-2)
22   at 53-54, 64; *see also id.* at 70.)

ORDER- 4

1    The altercation between Mr. Jones and Ms. Jones began inside the house they were

2    visiting on the Reservation, but then moved outside.  (*Id.* at 56-57.)  Mr. Jones has

3    acknowledged that, following the altercation, he removed M.J. from the Reservation over

4    Ms. Jones' objection.  (Neil Decl. Ex. (Dkt. # 13-1) at 48.)  He admitted "grabbing" M.J.

5    and "block[ing]" Ms. Jones from retrieving M.J.  (*Id.* at 51.)  After Mr. Jones had placed

6    M.J. in his car, Ms. Jones attempted to remove M.J. from the car.  (*Id.* at 48.)  During at

7    least part of the altercation, the vehicle was in motion, and Mr. Jones alleges that Ms.

8    Jones attempted to remove M.J. from the moving vehicle.  (*Id.* at 48, 52.)  Ms. Jones

9    counters that she did not attempt to remove M.J. from a moving vehicle, but did open the

10   vehicle door while it was in motion because Mr. Jones refused to stop the car after her

11   repeated requests.  (*Id.* at 59.)  Ms. Jones testified that Mr. Jones initially got into his car

12   and decided to leave the scene because he knew the police had been called.  (*Id.* at 57.)

13   Both Mr. Jones and Ms. Jones testified before the LTC that M.J. and Ms. Jones's minor

14   son were present during and witnessed these acts of domestic violence on Lummi

15   Reservation trust land.  (*Id.* at 51-52, 58-59.)  The LTC found that M.J. was a victim of

16   the domestic violence in that she was "tugged back and forth" between the parents.  (*Id.*

17   at 61.)

18       Following the entry of an order of protection against Mr. Jones, the LTC also

19   issued an order awarding temporary custody of M.J. to her maternal aunt.[5]  (Neil Decl.

20

21       [5]Supervised visitation with Mr. Jones is permitted under the LTC order (*id.* Ex. (Dkt.
22   # 14-2) at 10-11), but Mr. Jones has testified that M.J.'s maternal aunt has not always made M.J.
     available for the required visitation (11/26/12 Jones Decl. (Dkt. # 15-1) at 3).

1   Ex. (Dkt. # 14-1) at 3-7, Ex. (Dkt. # 14-2) at 5-6, 10-13.)  It is the order awarding

2   temporary custody of M.J. to her maternal aunt that is at issue in this lawsuit, and not the

3   original order of protection.  Indeed, Mr. Jones stipulated to the jurisdiction of the LTC

4   with respect to order of protection.  (Neil Decl. (Dkt. 13-1) at 27.)  He has not, however,

5   agreed to stipulate to LTC jurisdiction for purposes of the temporary custody order with

6   respect to M.J.  (*See id.*)

7        Ms. Jones is an enrolled member of the Northern Cheyenne.  (*Id.* at 23.)  LTC

8   acknowledges that Ms. Jones is not enrolled as a member of the Lummi Nation (Resp. at

9   2), but asserts that she is a descendant of the Lummi Nation (*id.* at 3).  Mr. Jones has

10  acknowledged that "Ms. Jones has some kind of informal affiliation with the Lummi

11  Indian Tribe."  (Compl. at 2.)  LTC also asserts that M.J. is a descendant of the Lummi

12  Nation and "maybe eligible for enrollment, but is not currently enrolled."  (*Id.* at 2.)[6]

13  M.J.'s maternal grandmother is currently an enrolled member of the Lummi Nation.  (*Id.*)

14       Contrary to the allegations of Mr. Jones, LTC asserts that Ms. Jones resides on

15  Lummi Reservation trust land, and has done so since 2010.  (Resp. at 4.)  Ms. Jones

16  testified before the LTC that she has lived on the Lummi Reservation since roughly the

17  end of 2010.  (Neil Decl. Ex. (Dkt. # 13-1) at 56.)  There are also assertions in the record

18  that Ms. Jones was incarcerated for a portion of the time she is claiming residency on the

19  Lummi Reservation, and that she is presently in a drug rehabilitation facility.  (Compl. at

20  3.)  The record is unclear regarding where M.J.'s maternal aunt currently lives, but there

21

22       [6]Mr. Jones has denied that M.J. is enrollable in the Lummi Nation.  (Compl. at 3.)

are assertions that she is not presently residing on the Lummi Reservation, but rather in Bellingham, Washington.  (*See* Neil Decl. Ex. (Dkt. # 14-2) at 21.)

Mr. Jones filed a motion in the LTC to dismiss the LTC's temporary child custody order on grounds that the LTC lacked jurisdiction.  (*See* Neil Decl. Exs. (Dkt. ## 12-3, 13-1).)  The LTC denied Mr. Jones's motion based in part of the fact that Mr. Jones's acts of domestic violence against Mrs. Jones occurred on Reservation trust land and the violence involved M.J.  (*Id.* Ex. (Dkt. # 13-1) at 61-62.)  Mr. Jones has appeal this order to the Lummi Nation Court of Appeals ("LNCOA").  (2nd Neil Decl. (Dkt. # 31) Ex. 3 (attaching Mr. Jones's Notice of Appeal).)  Ordinarily, an appellate hearing in the LNCOA is scheduled within fifty-six (56) days of the filing of a notice of appeal.  (Def. Supp. Mem. (Dkt. # 19) at 6; Neil Decl. Ex. 6 (Dkt. # 14-5) (attaching Title 1 of the Lummi Nation Code of Laws – Tribal Court Establishment and Administration) at 24 (*see* § 1.07.060) ("Within fifty-six (56) days from the date of the transmittal of a written notice of appeal, the appellate court shall convene, unless delay is warranted by good cause, to hear the case on appeal at such place as may be designated.").)  As of the date of this order, there is nothing in the record indicating that the LNCOA has either held a hearing or issued a decision with respect to Mr. Jones's appeal.

## III.  ANALYSIS

### A.  Standards for a Preliminary Injunction

The court is authorized to issue a preliminary injunction by Federal Rule of Civil Procedure 65(b).  *See* Fed. R. Civ. P. 65(b).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer

1    irreparable harm in the absence of preliminary relief, that the balance of equities tips in

2    his favor, and that an injunction is in the public interest."  *See Alliance For The Wild*

3    *Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Natural*

4    *Resources Defense Council*, 555 U.S. 7, 20 (2008)).  Alternatively, if the plaintiff

5    establishes that he is likely to suffer irreparable harm, the injunction is in the public

6    interest, and the balance of equities "tips sharply in the plaintiff's favor," then the

7    plaintiff need only raise "serious questions going to the merits" to be entitled to

8    injunctive relief.  *Id*. at 1134–35 (holding that this formulation of the Ninth Circuit's

9    sliding scale test for a preliminary injunction survived the Supreme Court's decision in

10   *Winter*).

11       As discussed below, under well-established Ninth Circuit authority, Mr. Jones is

12   required to exhaust his tribal court remedies prior to seeking relief in federal court.  There

13   is no dispute that he has not done so.  Thus, Mr. Jones's motion for a preliminary

14   injunction fails because he is unable to establish that he is likely to succeed on the merits

15   or that he raises "serious questions" going to the merits.[7]  Accordingly, the court must

16   deny his motion.

17   //

18   //

19

20   _____

21   [7]Because Mr. Jones cannot demonstrate either that he is likely to succeed on the merits or
     that he has raised serious questions going to the merits (at least one of which is necessary for
22   obtaining a preliminary injunction), the court need not discuss the remaining requirements for
     entry of a preliminary injunction.

**B.  Mr. Jones's Has Failed to Exhaust His Tribal Court Remedies and Therefore Is Not Entitled to a Preliminary Injunction**

As a non-Indian, Mr. Jones "may bring a federal common law cause of action under 28 U.S.C. § 1331 to challenge tribal court jurisdiction." *Boozer v. Wilder*, 381 F.3d 931, 934 (9th Cir. 2004) (citing *Nat'l Farmers Union Ins. Cas. v. Crow Tribe of Indians*, 471 U.S. 845, 850-53 (1985)).[8]  He must, however, ordinarily exhaust his tribal court remedies first.  "Although § 1331 encompasses the federal question whether a tribal court has exceeded the lawful limits of its jurisdiction, . . . exhaustion is required before such a claim may be entertained by a federal court."  *Id*. at 935 (citing *Nat'l Farmers*, 471 U.S. at 857).  Further, federal courts must give a tribal court a full opportunity to determine its own jurisdiction, which includes exhausting opportunities for appellate review in tribal courts.  *Id*. (citing *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16-17 (1987)).[9]

---

[8]In addition to seeking declaratory relief, Mr. Jones also styled his action, alternatively, as a petition for habeas corpus challenging the propriety of the LTC's temporary order of custody with respect to M.J. under the Indian Civil Rights Act ("ICRA"), 25 U.S.C. § 1303. Based on *Boozer v. Wilder*, 381 F.3d 931, 934 n.2 (9th Cir. 2004), the court previously concluded that "Mr. Jones is not entitled to habeas relief under the ICRA with respect to the facts alleged in his petition."  (11/5/12 Order (Dkt. # 5) at 3, n.1.)  Nevertheless, 28 U.S.C. §1331 provides an alternate source for the court's exercise of subject matter jurisdiction here.

[9]Citing *Ford Motor Co. v. Todecheene and Navajo Nation District Court*, 394 F.3d 1170, 1183 (9th Cir. 2005), Mr. Jones asserts that all that is required for exhaustion is for the tribal court to be afforded the opportunity to make an initial determination regarding tribal jurisdiction. (Reply at 7.)  This Ninth Circuit decision, however, was subsequently withdraw and superseded by *Ford Motor Co. v. Todecheene*, 474 F.3d 1196 (9th Cir. 2007), *amended by Ford Motor Co. v. Todecheene*, 488 F.3d 1215 (9th Cir. 2007).  In its superseding and amended opinion, the Ninth Circuit ruled that the tribal court did not "plainly" lack jurisdiction.  *Id.* at 1216. Accordingly, the Ninth Circuit stayed the federal proceeding until the defendant had exhausted its tribal court remedies, including appeals.  *Id.*

ORDER- 9

1    Exhaustion of tribal remedies is prudential.  *Id.*  It is required as a matter of

2    comity, not as a jurisdictional prerequisite.  *Id.*  "The Supreme Court has outlined four

3    exceptions to the exhaustion rule:  (1) when an assertion of tribal court jurisdiction is

4    'motivated by a desire to harass or is conducted in bad faith'; (2) when the tribal court

5    action is 'patently violative of express jurisdiction prohibitions'; (3) when exhaustion

6    would be 'futile' because of a lack of an adequate opportunity to challenge the tribal

7    court's jurisdiction; and (4) when it is 'plain' that tribal court jurisdiction is lacking, so

8    that the exhaustion requirement 'would serve no purpose other than delay.'"  *Elliot v.*

9    *White Mountain Apache Tribal Court*, 566 F.3d 842, 847 (9th Cir. 2009) (quoting

10   *Nevada v. Hicks*, 533 U.S. 353 (2001)).

11   Mr. Jones asserts that exceptions one, three, and four apply to the exhaustion

12   requirement with respect to the LTC child custody order.  (Reply (Dkt. # 15) at 7-11.)

13   First, Mr. Jones asserts that the LTC proceedings were conducted in bad faith.  (Reply at

14   8-9.)  Mr. Jones complains about the entry of the order of protection against him.  He

15   asserts that the order was entered following the court's hearing on Ms. Jones's motion,

16   but prior to a hearing where the written order was to be presented by the parties to the

17   court for entry.  (*See* 11/28/12 Lewis Decl. (Dkt. # 15-3) Ex. 3.)  LTC has responded

18   providing evidence that Mr. Jones was in the courtroom on November 5, 2012, when the

19   LTC issued its oral ruling on Ms. Jones's motion and discussed the content of the order

20   (Neil Decl. Ex. (Dkt. # 13-1) at 61-62; 69-70), that the court's oral ruling was

21   memorialized in a written order and filed on November 6, 2012 (Neil Decl. Ex. (Dkt. #

22   14-1) at 7), and that the November 5, 2012, transcript does not reflect any discussion of a

1   presentation hearing.  (*See generally* Def. Supp. Mem. (Dkt. # 19) at 2-3.)  Mr. Jones's

2   counsel subsequently filed a "motion for presentation" of the order, was granted a

3   hearing, and had a subsequent opportunity to contest the language of the November 6,

4   2012 order.  (Def. Supp. Mem. at 4-9 (citing Neil Decl. Ex. (Dkt. # 14-1); Ex. (Dkt. # 13-

5   2)).)  On this record, the court cannot conclude that the LTC's proceedings were

6   conducted in bad faith.

7          More importantly, however, the LTC proceeding involving the order of protection

8   entered against Mr. Lewis is not the LTC proceeding that is at issue here.  Mr. Jones

9   consented to LTC jurisdiction with respect to the protection order against him and those

10  proceedings are not before this court.  (*See* Neil Decl. (Dkt. 13-1) at 27.)  The only

11  proceeding at issue here is the LTC proceeding related to the temporary custody order

12  involving M.J.  With respect to that proceeding, the LTC has submitted a transcript of the

13  hearing at which the LTC heard Mr. Jones's motion to dismiss for lack of jurisdiction.

14  (Neil Decl. Ex. (Dkt. # 13-1).)  The LTC heard testimony from both Mr. Jones and Mrs.

15  Jones, as well as extensive argument from counsel for both parties.  (*See generally id.*)

16  Although Mr. Jones lost his jurisdictional motion, nothing in the record of this court

17  indicates evidence of "bad faith" or a motivation to harass with respect to the child

18  custody proceedings at issue here.[10]

19

20

21          [10]The court notes, however, that should issues arise as Mr. Jones pursues his appeal with

22  the LTC that warrant this court to reassess whether this exception to the general exhaustion
    requirement should apply, counsel should feel free to raise those issues with the court.

1      Mr. Jones also asserts that any appeal of the LTC's order on jurisdiction is "futile"

2   because his counsel has had difficulty obtaining information about and in navigating the

3   LTC appeal process.  (*See* Reply at 9; Pl. Supp. Mem. (Dkt. # 18) at 3.)  Mr. Jones's

4   counsel submitted a declaration with respect to his difficulties.  (11/28/12 Lewis Decl.

5   (Dkt. # 15-2).)  The substance of this declaration is based on hearsay conversations

6   between Mr. Jones's counsel's staff and LTC staff.  (*See id.*)  Accordingly, the court does

7   not consider the hearsay portion of this declaration.  *See* Fed. Evid. R. 801, 802.  Even if

8   the court were to consider the hearsay contained in the declaration, the LTC has

9   submitted sufficient information and documentation concerning the LTC appeal process

10  and procedures to satisfy the court that Mr. Jones's pursuit of an appeal within the LTC

11  system would not be futile.  (*See* Def. Supp. Mem. (Dkt. # 19) at 6-7; Neil Decl. Ex.

12  (Dkt. # 14-5); 2nd Neil Decl. (Dkt. # 21); 2nd McIntyre Decl. (Dkt. # 22).)

13      Finally, Mr. Jones asserts that it is "plain" that LTC jurisdiction is lacking.  (Reply

14  at 9-11.)  Under this exception, if tribal court jurisdiction is merely "colorable" or

15  "plausible," or then the exception does not apply and exhaustion of tribal court remedies

16  is required.  *Elliot v. White Mountain Apache Tribal Court*, 566 F.3d 842, 848 (9th Cir.

17  2009) (quoting *Atwood v. Fort Peck Tribal Court Assiniboine*, 513 F.3d 943, 948 (9th

18  Cir. 2008)); *see also Boozer v. Wilder*, 381 F.3d 931, 935 n. 3 (9th Cir. 2004) (suggesting

19  that if the argument in favor of tribal court jurisdiction is "not frivolous," then it would

20  not be "plain" that tribal court jurisdiction is lacking).

21      Any analysis of tribal court jurisdiction over non-members must begin with *United*

22  *States v. Montana*, 450 U.S. 544 (1981).  In *Montana*, the Supreme Court explained that

1   there are two sources of tribal jurisdiction over non-members:  (1) through the inherent

2   sovereignty of the tribe or (2) by way of positive law (such as statute or treaty).  *Id*. at

3   564.

4        The first source of tribal court jurisdiction—the inherent sovereignty of the tribe—

5   is limited and centers on the land held by the tribe or tribal members within the

6   reservation.  *Plains Commerce Bank v. Long Family Land & Cattle Co., Inc.*, 554 U.S.

7   316, 327 (2008).  The Supreme Court has stated "the inherent sovereign powers of an

8   Indian tribe do not extend to the activities of non-members of the tribe."  *Id*. at 328.

9   There are, however, two exceptions to where tribal court jurisdiction based on inherent

10  sovereignty may extend to non-members.  *See Phillip Morris, USA, Inc. v. King*

11  *Mountain Tobacco Co. Inc.*, 569 F.3d 932, 941-43 (9th Cir. 2009); *Martinez v. Martinez*,

12  No. C08-5503 FDB, 2008 WL 5262793, at *4 (W.D. Wash. Dec. 16, 2008).  The first

13  exception relates to nonmembers who enter into consensual relationships with the tribe or

14  its members.  *Strate v. A-1 Contractors*, 520 U.S. 438, 446 (1997).  The second concerns

15  activities of nonmembers on tribal trust land that directly affects the tribe's political

16  integrity, economic security, health or welfare.  *Id*. at 446-47.

17       The LTC asserts that the first exception comes into play because Mr. Jones

18  consented to LTC jurisdiction with respect to the LTC order of protection.  (Resp. at 12.)

19  Mr. Jones's consent to LTC jurisdiction with respect to the order of protection, however,

20  does not mean that he has consented to LTC jurisdiction with respect to the child custody

21  decree.  Indeed, he has expressly denied consent to LTC jurisdiction with respect the

22  child custody hearing.  "A nonmember's consensual relationship in one area . . . does not

1   trigger tribal civil authority in another – it is not 'in for penny, in for a Pound.'" *Town*

2   *Pump, Inc. v. LaPlante*, 394 Fed. App'x 425, 427 (9th Cir. 2010) (unpublished) (quoting

3   *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 656 (2001) (nonmember's consent to

4   tribal court jurisdiction by making a third-party claim in a prior litigation did not

5   constitute consent to tribal court jurisdiction in a later suit involving different claims and

6   different parties); *see also Plains Commerce Bank*, 554 U.S. at 341-42 (stating that the

7   fact that a nonmember sought a tribal court's aid in serving process on tribal members in

8   one matter does not constitute consent to future litigation in tribal court as a defendant,

9   especially when the nonmember contends that the tribal court lacks jurisdiction over it).

10   Thus, the fact that Mr. Jones consented to LTC jurisdiction with respect to the order of

11   protection between himself and his wife does not constitute consent to LTC jurisdiction

12   with respect to the LTC's order pertaining to the custody of M.J.

13        The second exception concerns activities of nonmembers on tribal trust land that

14   directly affect the tribe's political integrity, economic security, health or welfare. *Strate*

15   *v. A-1 Contractors*, 520 U.S. at 446-47.  The LTC asserts that Mr. Jones committed acts

16   of domestic violence on tribal trust land that were inflicted upon Mrs. Jones (who is the

17   child of an enrolled member), M.J. (who is the grandchild of an enrolled member), and

18   M.J.'s brother (who is an enrolled member).  (Resp. at 10.)  The LTC's implicit assertion

19   is that Mr. Jones's behavior directly affected the health and welfare of tribal members or

20   their descendants, and that this activity falls within the second exception to the limitation

21   on the exercise of a tribal court's inherent sovereignty over non-members.  Indeed, this

22   exception appears to be the grounds upon which Judge Cardoza based her ruling

1   (although not expressly) that the LTC had jurisdiction over the custody issue.  (*See* Neil

2   Decl. Ex. (Dkt. # 13-1) at 61-62.)

3         Mr. Jones's arguably tortious conduct, however, was not directed at the tribe, but

4   rather at his wife or other family members.  Such conduct will not support tribal

5   jurisdiction over nonmembers.  As the Ninth Circuit stated in *Philip Morris USA, Inc. v.*

6   *King Mountain Tobacco Co., Inc.*, 569 F.3d 932 (9th Cir. 2009), stated:

7           To some extent, it can be argued that torts committed by or against Indians
    on Indian land always threaten or have some direct effect on the political
8           integrity, the economic security, or the health or welfare of the tribe.  But
    this generalized threat that torts by or against its members pose for any
9           society, is not what the second *Montana* exception is intended to capture.
    Rather, the second exception envisions situations where the conduct of the
10          nonmember poses a direct threat to tribal sovereignty.

11  *Id*. at 943 (citations; quotations; modification omitted); *see also Atkinson*, 532 U.S. at 657

12  n.12 ("Montana's second exception can be misperceived.  The exception is only triggered

13  by nonmember conduct that threatens the Indian tribe; it does not broadly permit the

14  exercise of civil authority wherever it might be considered necessary to self-

15  government.") (internal quotations omitted).  Thus, LTC jurisdiction cannot be justified

16  based on the second exception to the limitation on inherent tribal court jurisdiction over

17  non-members.

18        In addition to inherent sovereignty, the court must consider whether LTC

19  jurisdiction is plausible or colorable "by way of positive law."  *Montana*, 450 U.S. at 564.

20  Although neither party devotes much analysis to the Indian Child Welfare Act of 1978

21  ("ICWA"), 25 U.S.C. §§ 1901-1963, the court concludes, based on the discussion below,

22

ORDER- 15

1  that the LTC has at least "colorable" or "plausible" jurisdiction to determine M.J.'s

2  custody under this statute.  *See Elliot*, 566 F.3d at 848.

3      ICWA establishes exclusive jurisdiction in tribal courts for child custody

4  proceedings[11] concerning an Indian child "who resides or is domiciled within the

5  reservation of such tribe."  25 U.S.C. § 1911(a).[12]  Under ICWA, "an Indian child" is

6  defined as "any unmarried person who is under age eighteen and is either (a) a member of

7  an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological

8  child of a member of an Indian tribe."  25 U.S.C. § 1903(4).  The LTC has stated "M.J. is

9  a descendant of the Lummi Nation and may be eligible for enrollment, but is not

10  currently enrolled."  (Resp. at 2.)  Based on this assertion, at first glance, it appears that

11  ──────────────────

12      [11]Under ICWA, a "child custody proceeding" includes "foster care placement" which

13  means "any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights

14  have not been terminated."  25 U.S.C. § 1903(1)(i).  The provision expressly excludes "a placement based . . . upon an award, in a divorce proceeding, of custody to one of the parents."

15  25 U.S.C. § 1903.  Mr. Jones asserts that this exclusion applies.  However, there is no evidence of any on-going divorce proceedings between Mr. Jones and Ms. Jones at the time the LTC

16  issued its temporary custody order involving M.J.  At most, there is a statement from Mr. Jones (subsequent to the order at issue here) that he intends to file dissolution proceedings against Ms.

17  Jones in the future.  (11/26/12 Jones Decl. (Dkt. # 15-1) at 3 ("I intend to file a Petition for Dissolution in State Court on November 27, 2012.").)  Further, the order issued by the LTC did

18  not "award . . . custody to one of the parents," but rather to a "foster home" or "the home of a guardian or conservator."  25 U.S.C. § 1903.  Thus, the court finds that the proceedings at issue in the LTC would meet the statutory definition of a "child custody proceeding," and the

19  exclusion relied upon by Mr. Jones is not applicable.

20      [12] Section 1911(b) establishes concurrent, but presumptively, tribal jurisdiction in cases where Indian children are not domiciled on the reservation.  25 U.S.C. § 1911(b).  Under section

21  1911(b), on petition of either parent or the tribe, state-court proceedings for foster care placement or termination of parental rights are to be transferred to the tribal court, except in cases of "good

22  cause," objection by either parent, or declination of jurisdiction by the tribal court.  *See Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989).

M.J. would not qualify under 25 U.S.C. § 1903(4)(a) as "a member of an Indian tribe." However, although "[e]nrollment is a common evidentiary means of establishing Indian status," "it is not the only means nor is it necessarily determinative." *United States v. Broncheau*, 597 F.2d 1260, 1263 (9th Cir. 1979). Nevertheless, the LTC has not asserted that M.J. is a tribal member, only that she "may be eligible for enrollment." (Resp. at 2.) To the court's knowledge, the Lummi Nation has not made any determination regarding M.J.'s status as a member.[13]

M.J. may also qualify as an Indian child under § 1903(4)(b) if she is merely eligible for membership. There is no dispute that M.J. is a descendent of the Lummi Nation and that her grandmother is an enrolled member. The LTC has stated that M.J. "may be eligible for enrollment." (Resp. at 2.) Thus, it is certainly "plausible" or "colorable" that M.J. is "eligible for membership" as required under 25 U.S.C. § 1903(4)(b).

Section 1903(4)(b) also requires that M.J. be "the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4)(b). Although M.J.'s mother is not a member of the Lummi Nation, there is no dispute that she is a member of the Northern Cheyenne.[14]

---

[13]Membership is a decision that is ordinarily left up to the tribe. *Williams v. Gover*, 490 F.3d 785, 789 (9th Cir. 2007) ("An Indian tribe has the power to define membership as it chooses, subject to the plenary power of Congress."); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 (1978) ("A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community."); *Adams v. Morton*, 581 F.2d 1314, 1320 (9th Cir. 1978) ("[U]nless limited by treaty or statute, a Tribe has the power to determine tribal membership.").

[14]Under ICWA, an Indian tribe means in pertinent part "any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided

1    (*See* Jones Decl. Ex. 1 (attaching "Certificate of Indian Blood" from Northern Cheyenne

2    Tribe for Ms. Jones and noting that she is "enrolled").)  There is no express statutory

3    requirement that M.J. be the biological child of a member of the Lummi Nation.

4    Although this may have been the implicit intent of the statute, there is no express

5    requirement to this effect.  Thus, M.J. appears to meet the technical statutory requirement

6    of being "the biological child of a member of an Indian tribe."  25 U.S.C. § 1903(4)(b).

7    The court found no case law discussing this specific issue.  Thus, it is at least "colorable"

8    or "plausible" that M.J. would meet the second requirement of 25 U.S.C. § 1903(4)(b) as

9    well.

10          In addition, to meeting the statutory requirement for being "an Indian child," M.J.

11   must also "reside" or be "domiciled" on the Lummi Reservation for the LTC to have

12   exclusive jurisdiction under ICWA.  *See* 25 U.S.C. § 1911(a).  Mr. Jones asserts that M.J.

13   has never lived on the Lummi Reservation and thus cannot be domiciled there.  ICWA

14   does not define the term "domicile."  Nevertheless, the Supreme Court has provided

15   guidance on this issue.  In *Holyfield*, the Supreme Court was charged with determining

16   the domicile of twin Indian children under ICWA.  *Holyfield*, 490 U.S. at 43.  The twins'

17   biological parents were both members of the Tribe, but the twins had been born off of the

18   reservation and had never resided there.  A Mississippi state court had entered a decree of

19

20   to Indians by the Secretary because of their status as Indians."  25 U.S.C. § 1903(8).  No party
21   has asserted that the Northern Cheyenne does not meet this statutory definition.

22

1   adoption for the twins that did not reference ICWA nor the twins' Indian heritage.  *Id.* at

2   37-38.   The Mississippi Supreme Court held that the twins were not domiciled on the

3   reservation in part because they had never been physically present there.  *Id.* at 47.  The

4   United States Supreme Court reversed.  The Supreme Court held that for adults "domicile

5   is established by physical presence in a place in connection with a certain state of mind

6   concerning one's intent to remain there."  *Id.* at 48.  "Since most minors are legally

7   incapable of forming the requisite intent to establish a domicile, their domicile is

8   determined by that of their parents."  *Id.*  The Supreme Court found that because the

9   domicile of both parents was on the reservation, "it was clear that at birth the twin babies

10  were also domiciled on the reservation, even though they themselves had never been

11  there."  *Id.* at 48-49.  Thus, the physical residence of M.J. is not determinative of her

12  domicile under ICWA.  Rather, according to the Supreme Court, M.J.'s domicile is

13  determined by that of her parents.

14          In the present case, M.J.'s parents, although still married, have been separated for

15  some period of time—perhaps for as long as two years.  Mr. Jones presently lives in Oak

16  Harbor, Washington (Jones Decl. at 2), and it is likely that this is his domicile as well.

17  Ms. Jones asserts that she has been living on the Lummi Reservation for approximately

18  two years.  (Neil Decl. Ex. (Dkt. # 13-1) at 56).  Thus, it is likely that the Lummi

19  Reservation is her domicile now.[15]  According to *Holyfield*, M.J.'s domicile should be

20  _____

21          [15]Mr. Jones has asserted that Ms. Jones may not claim residency or domicile on the
    Lummi Reservation because she was incarcerated for a portion of the time she claims to have
22  been living on the Reservation and she is presently staying at a drug rehabilitation center away

1    determined based on her parents' domicile.  490 U.S. at 48.  Unlike *Holyfield*, however,

2    the court's determination of M.J.'s domicile is complicated by the fact that M.J.'s parents

3    are domiciled in two different places.[16]

4           The court acknowledges that it is certainly possible (perhaps even likely) that

5    M.J.'s domicile is in Oak Harbor particularly in light of the fact that she lived with Mr.

6    Jones following her parents' separation and prior to the LTC's temporary child custody

7    order.  Indeed, the current modern view is that where parents have separate domiciles, the

8    child's domicile is the same as that of the parent with whom the child lives or resides.

9    *See In re Adoption of S.S. & R.S.*, 657 N.E. 2d 935, 941 (Ill. 1995) ("Although [the Indian

10   mother] was domiciled on the reservation, the children's [non-Indian] father was not, had

11   never been, and did not want to be.  His domicile was Illinois.  Because he had sole

12   custody of the children, that was their domicile as well."); *see also Hernandez v. Baker*,

13

---

14   from the Reservation.  However, as noted above, an adult may have more than one residence,
15   and domicile involves not only one's presence in a locale but an intent to remain there as well.
     Thus, the fact that one has been involuntarily incarcerated or temporarily resides at a
16   rehabilitation facility does not necessary result in a change in domicile.  *See Brandon v. Debus*,
     289 Fed. App'x 181, 183 (9th Cir. 2008) ("[I]t was certainly possible for [an individual] to retain
17   his previous domicile while incarcerated in Arizona, if he did not intend to remain in Arizona
     after his release from jail.") (unpublished); *see also Cohen v. United States*, 297 F.2d 760, 774
18   (9th Cir. 1962) ("One does not change his residence to prison by virtue of being incarcerated
     there.").

19          [16]A person may have more than one residence, but only one domicile, and may reside
     somewhere other than her domicile. *See, e.g., United States v. Venturella*, 391 F.3d 120, 125 (2d
20   Cir. 2004) ("'Residency means an established abode, for personal or business reasons, permanent
     for a time.  A resident is so determined from the physical fact of that person's living in a
21   particular place.  One may have more than one residence in different parts of this country or the
     world, but a person may have only one domicile.  A person may be a resident of one locality, but
22   be domiciled in another.'") (quoting *Rosario v. INS*, 962 F.2d 220, 224 (2d Cir. 1992)).

ORDER- 20

1    *III*, 936 F.2d 426, 428 n.1 (9th Cir. 1991) (noting that "currently accepted view is that

2    where the parents have separate domiciles, the child's domicile is that of the parent with

3    whom the child lives.").  There is no serious dispute that M.J. lived with her father in Oak

4    Harbor, Washington, after her parents separated and prior to the LTC temporary order of

5    custody.  Thus, a *pro forma* application of well-settled state law concerning domicile

6    would initially lead the court toward a finding that M.J.'s domicile is in Oak Harbor.  If

7    this is in fact so, then the LTC would not have jurisdiction under ICWA with respect to

8    the custody proceedings at issue here.

9            The United States Supreme Court, however, has indicated that state law

10   concerning residency and domicile may not be employed in developing a uniform federal

11   law of domicile under ICWA in a manner that would undermine ICWA's purposes. [17]

12   *See Holyfield*, 490 U.S. at 52, n. 26 ("The clear implication is that state law that did tend

13   to undermine the ICWA's purposes could not be taken to express Congress' intent.").

14   ICWA's purposes include protecting the tribe's ability to assert its interest in its children.

15   *Id.* at 52.  "The protection of this tribal interest is at the core of the ICWA, which

16   recognizes that the tribe has an interest in the child which is distinct from but on a parity

17   with the interest of the parents."  *Id.* (quoting *In re Adoption of Halloway*, 732 P.2d 962,

18

19           [17]The Supreme Court has declared that "it [is] beyond dispute that Congress intended a
20   uniform federal law of domicile for the ICWA."  *Holyfield*, 490 U.S. at 47.  Nevertheless,
     "[w]ell-settled state law can inform our understanding of what Congress had in mind when it
21   employed a term it did not define."  *Id.*  Thus, the Supreme Court has sanctioned the "borrow[ing
     of] established common-law principles of domicile to the extent that they are not inconsistent
22   with the objectives of the congressional scheme."  *Id.* at 47-48.

969-70 (Utah 1986)).  Indeed, the Supreme Court has recognized that the interest of the

tribe in this regard "finds no parallel in other ethnic cultures found in the United States,"

and "is a relationship that many non-Indians find difficult to understand and that non-

Indian courts [have been] slow to recognize."  *Id.* (quoting *In re Adoption of Halloway*,

732 P.2d at 969-70).  For example, the Supreme Court refused to allow state

abandonment law to operate in a manner that would permit the children's parents to

change the children's domicile as part of a scheme to facilitate the children's adoption by

non-Indians.  *Id.* at 53 ("State abandonment law cannot be used to frustrate the federal

legislative judgment expressed in ICWA that the interests of the tribe in custodial

decisions made with respect to Indian children are as entitled to respect as the interests of

the parents.") (quoting *In re Adoption of Halloway*, 732 P.2d at 969-70).

Accordingly, the court finds that it is as least "plausible" or "colorable" that the

state rules concerning domicile discussed above should not be mechanically applied or

construed in a manner that would permit one parent of an Indian child to assume custody

of that child without court order and over the objection of the other parent thereby

defeating the interests of the tribe in decisions concerning the child's custody.  This may

be particularly so where there are allegations of domestic violence that affect the non-

custodial parent's ability to assert his or her wishes concerning the child's custody,

residency, or domicile.  As discussed above, domicile ordinarily involves both physical

presence in a locale along with an intent to remain there.  *See Holyfield*, 490 U.S. at 48.

Because minors are legally incapable of forming the requisite intent, their domicile

generally follows that of their parents.  *Id.*  As noted, the typical rule where the child's

1   parents are separated and have two different domiciles is that the child's domicile follows

2   that of the custodial parent.  *See In re Adoption of S.S. & R.S.*, 657 N.E. 2d at 941;

3   *Hernandez*, 936 F.2d at 428 n. 1.  This rule generally makes sense because the decision

4   about which parent should have primary or sole custody ordinarily would reflect the

5   intent of both parents (as determined either through negotiation or by way of court order)

6   regarding where the child should live and remain.

7          The facts before the court, however, do not constitute the typical case.  Without

8   deciding the issue, the court notes that there is some evidence in the record to support the

9   notion that Ms. Jones did not consent to Mr. Jones's custody of M.J. and M.J.'s residency

10  in Oak Harbor.  Further, there is no evidence that M.J.'s custody arrangement with Mr.

11  Jones ever obtained the approbation of any court.[18]  Thus, it is at least "plausible" or

12  "colorable" to assert that M.J.'s residency with her father does not reflect the "intent" of

13  her parents and therefore is not determinative of her domicile.  Particularly in light of the

14  allegations of domestic violence in this action, the court cannot say that it is frivolous to

15  assert that M.J.'s domicile is not with her father in Oak Harbor, but rather with her

16  mother on the Lummi Reservation.  Based on the foregoing, the LTC's exercise of

17  exclusive jurisdiction under ICWA is at least "colorable" or "plausible."  As such, Mr.

18  Jones is required to exhaust his tribal court remedies, including appealing the LTC's

19

20  _____

21      [18]At most, Mr. Jones produced a letter(s) or parts of a letter(s) from DCS indicating that
    Ms. Jones may owe Mr. Jones child support as part of an administrative proceeding.  (10/29/12

22  Jones Decl. Ex. 7.)

1   present ruling that it has jurisdiction, prior to seeking redress in federal court.  *See*

2   *Boozer*, 381 F.3d at 934.

3          Because Mr. Jones has failed to exhaust his tribal court remedies, he has also

4   failed to demonstrate either a likelihood of success on the merits or serious issues going

5   to the merits as is required to obtain preliminary injunctive relief under Federal Rule of

6   Civil Procedure 65.  *See Alliance for the Wild Cottell*, 632 F.3d at 1131-34.  Accordingly,

7   the court denies his motion for a preliminary injunction.

8                                     **IV.  CONCLUSION**

9          The court DENIES Mr. Jones's motion for a preliminary injunction in this matter

10  (Dkt. # 3).  Further, as a matter of discretion, the court may either dismiss a non-

11  exhausted action or stay the action while the tribal court handles the matter.  *Atwood*, 513

12  F.3d at 948 (citing *Nat'l Farmers*, 471 U.S. at 857).  Here, the tribal court has already

13  initially determined that it has jurisdiction, and Mr. Jones has appealed to the Lummi

14  Nation Court of Appeals.  The LTC has stated that, ordinarily, an appellate hearing is

15  scheduled within fifty-six (56) days of the filing of a notice of appeal.  (Def. Supp. Mem.

16  at 6.)  The court finds that because the appellate process is already underway, it is prudent

17  to simply stay the action pending Mr. Jones's exhaustion of his tribal remedies.

18  Accordingly, the court further orders the parties to submit a joint status report describing

19  the status of the tribal court proceedings herein no later than ten days following the

20  //

21  //

22

ORDER- 24

1 conclusion of those proceedings and all tribal court appeals, or within sixty days of the

2 date of this order, whichever date comes first.

3     Dated this 10th day of December, 2012.

4

5

6     JAMES L. ROBART
      United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 25